UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ROBERT O'CONNELL, | ) |
| Plaintiff, | ) |
| | ) Civil Action No. |
| v. | ) 19-11654-FDS |
| WILLIAM G. GROSS, Commissioner of the Boston Police Department; JOHN MCDONOUGH, Lieutenant Detective Licensing Unit; ANGELA COLEMAN, Police Officer; and COMMONWEALTH OF MASSACHUSETTS OFFICE OF THE ATTORNEY GENERAL, | ) |
| Defendants. | ) |

## MEMORANDUM AND ORDER ON MOTIONS TO DISMISS

**SAYLOR, C.J.**

This is a case involving a claim that certain firearm-licensing fees violate the Second Amendment. Plaintiff Robert O'Connell, who is proceeding *pro se*, is a Massachusetts citizen who applied for a license to carry a firearm in Boston. According to O'Connell, in the course of pursuing a license he incurred various expenses, including a $100 application fee, a $100 fee to take a safety course at a private facility, and a $100 fee for another course at the same facility. He contends that the costs associated with state and city license requirements impermissibly burden the exercise of his Second Amendment rights.

On August 1, 2019, O'Connell filed suit against Boston Police Department Commissioner William G. Gross, then-Lieutenant Detective John McDonough, Officer Angela Coleman, and the Massachusetts Attorney General's Office. He seeks an injunction against all licensing regulations that require fees from applicants, as well as money damages.

The Attorney General's Office has moved to dismiss for lack of subject-matter jurisdiction or, in the alternative, because the complaint fails to state a claim upon which relief can be granted. Defendants Gross, McDonough, and Coleman have also moved to dismiss for failure to state a claim.

For the following reasons, both motions will be granted.

## I. Background

Unless otherwise noted, the following facts are as alleged in the complaint.

### A. Regulatory Framework

The regulatory framework at issue arises under both state and local law. In Massachusetts, it is a crime to possess a firearm in public without a valid license to carry ("LTC"). Mass. Gen. Laws ch. 269, § 10(a). An LTC may be requested by application pursuant to Mass. Gen. Laws ch. 140, § 131(d). Applications are made to a "licensing authority," which is defined as either the applicant's local police chief or the board or officer having control of the police in a city or town. §§ 121, 131(d). Massachusetts law specifies the circumstances under which licenses may be granted, revoked, and restricted. *See* § 131.

To submit an application for an LTC, individuals must pay a $100 application fee. § 131(i). Of that fee, $25 is retained by the licensing authority; $50 is deposited into the General Fund of the Commonwealth, with provides at least $50,000 to the Firearm Licensing Review Board; and the remaining $25 is deposited into the Firearms Fingerprint Identity Verification Trust Fund. § 131(i).

In addition to paying the application fee, applicants must submit a "basic firearms safety certificate," although some applicants are exempted from doing so. § 131P(a). No Massachusetts statute expressly precludes or permits the imposition of a fee for obtaining such a

2

certificate. *See* § 131P(b).

Additional licensing steps may be required by the local licensing authority. In Boston, the licensing authority requires applicants to undergo an interview with a police officer and to complete a live course at the Boston Police Firearms Range on Moon Island in Quincy, Massachusetts. *See Gould v. Morgan*, 907 F.3d 659, 662 (1st Cir. 2018); (Compl. Ex. 6, 11).

After completing those steps, applicants may obtain an LTC, which, absent revocation, "shall be valid" for between five and six years. Mass. Gen. Laws ch. 140, § 131(i).

### B. O'Connell's Payment of Fees

Plaintiff Robert O'Connell is a resident of the city of Boston. According to the complaint, he is seeking an LTC for personal safety reasons. (Compl. 1; *id.* Ex. 9).

On March 19, 2014, O'Connell began the process of applying for an LTC by obtaining a firearm safety certificate. (Compl. Ex. 1 ¶ 2). To complete his firearm safety training, he paid a fee of $100 to Mass Firearms School, a private firearms training facility located in Holliston, Massachusetts. (*Id.*).

On December 14, 2018, O'Connell paid $100 to the City of Boston to apply for an LTC. (*Id.* ¶ 1). The same day, O'Connell was interviewed by Officer Angela Coleman, who is a member of the Licensing Unit of the Boston Police Department. (*Id.* ¶ 8).

To obtain his LTC, O'Connell needed to participate in the live course and classroom lecture at a Boston Police facility in Quincy. (*Id.* ¶¶ 11-12). In anticipation of that course, O'Connell paid an additional $100 to Mass Firearms School to learn how to handle the revolver used in the course. (*Id.* ¶ 12).

O'Connell alleges that he has incurred $300 in expenses and spent 15 hours of his time pursuing his LTC. (*Id.* Ex. 2 ¶ 3). He still has not completed the live course, but asserts that he

3

is "willing to do this if they pay [him] for the time." (Comp. ¶ 11).

## C. Procedural Background

On August 1, 2019, O'Connell filed this action. It alleges that the firearm licensing regulations of the City of Boston and the Commonwealth of Massachusetts constructively require citizens to "pay for a constitutional right." (*Id.* ¶ 6). He contends that the costs associated with these regulations create an unlawful burden on his constitutional rights. (*Id.* ¶¶ 3-6).[1] In addition, he seeks compensation for the time he spent going through the licensing process, which he values at $35 an hour. (*Id.*).

The civil cover sheet and complaint indicate that this action is brought under the "2nd Amendment [to the] U.S. Constitution." Although the complaint does not specify a statute giving rise to his cause of action, claims of alleged constitutional violations by state actors are typically brought under 42 U.S.C. § 1983. *See New England Reg'l Council of Carpenters v. Kinton*, 284 F.3d 9, 17 (1st Cir. 2002) ("Section 1983 guards against violations of federal rights by state actors."). The Court will presume that to be the case here.

O'Connell seeks two forms of relief. First, he seeks injunctive relief in the form of "Massachusetts and the City of Boston remov[ing] all financial barriers and pay[ing] for all of the expenses . . . that applicants incur when applying for a gun permit . . . ." (Comp. Ex. 2, ¶ 1). Second, he seeks damages for the money and time he has spent pursuing his LTC. (*Id.* ¶¶ 2-3). He requests $825 in damages, a number he calculates by adding $300 in out-of-pocket expenses

---

[1] O'Connell previously filed a similar suit against the Mayor of Boston, alleging the time required to obtain a firearm in Boston constituted a "burdensome obstacle" to his constitutional rights under the Second Amendment. *O'Connell v. Walsh*, No. 15-cv-10096-DJC, 2015 WL 9581735, at *1 (D. Mass. Dec. 30, 2015). The court dismissed the case, holding that his claim was not ripe and that, in any event, "the government's authority to regulate the possession and storing of firearms is well-established as a matter of constitutional law." *Id.* at *4.

to a $525 value for his time. (*Id.* ¶ 3).[2] He also seeks $400 in court fees. (*Id.*).

Thus, construed generously, the complaint asserts a § 1983 claim challenging the constitutionality of the fees associated with the Massachusetts licensing scheme as it operates in the City of Boston. Although O'Connell does not claim that any of the non-fee provisions of the scheme are themselves unconstitutional, he is suing for money damages to reimburse him for his time spent pursuing his LTC.

The Attorney General's Office has moved to dismiss for lack of subject-matter jurisdiction under Fed. R. Civ. P. 12(b)(1) and, in the alternative, failure to state a claim under Fed. R. Civ. P. 12(b)(6). Defendants Gross, McDonough, and Coleman (the "Boston Defendants") have separately moved to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6).

## II. <u>Legal Standard</u>

On a motion to dismiss, the Court "must assume the truth of all well-plead[ed] facts and give . . . plaintiff the benefit of all reasonable inferences therefrom." *Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citing *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999)). To survive a motion to dismiss, the complaint must state a claim that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). That is, "[f]actual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555 (citations omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678

---

[2] The complaint alleges that he spent 15 hours on "travel and training time," which he values at $35 an hour. (Compl. Ex. 2 ¶ 3).

(2009) (quoting *Twombly*, 550 U.S. at 556).  Dismissal is appropriate if the complaint fails to set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." *Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir. 2008) (quoting *Centro Medico del Turabo, Inc. v. Feliciano de Melecio*, 406 F.3d 1, 6 (1st Cir. 2005)).

A document filed by a *pro se* party "is to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)) (internal quotation marks omitted); *see also* Fed. R. Civ. P. 8(e) ("Pleadings must be construed so as to do justice.").  However, while *pro se* complaints are accorded an "extra degree of solicitude," *Rodi v. Ventetuolo*, 941 F.2d 22, 23 (1st Cir. 1991), they still must "set forth factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." *Gooley v. Mobil Oil Corp.*, 851 F.2d 513, 515 (1st Cir. 1998).

### III. <u>Analysis</u>

#### A. <u>Motion of Attorney General's Office</u>

The Attorney General's Office has moved to dismiss the claim for lack of subject-matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) or, in the alternative, for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6).

To the extent that the complaint is construed to be a suit against the Attorney General in her official capacity seeking prospective injunctive relief, *cf. Ex Parte Young*, 209 U.S. 123 (1908), it fails to state a claim for the reasons set forth below as to the Boston Defendants.  To the extent that it is construed to be a suit against the Attorney General's Office for money

damages, it is barred by the sovereign-immunity doctrine of the Eleventh Amendment.

"As a general matter, states are immune under the Eleventh Amendment from private suit in the federal courts, absent their consent." *Wojcik v. Massachusetts State Lottery Comm'n*, 300 F.3d 92, 99 (1st Cir. 2002) (internal quotations omitted). *See also Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 54 (1996); *Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985) (unless a State has "waived its Eleventh Amendment immunity or Congress has overridden it, . . . a State cannot be sued directly in its own name regardless of the relief sought."). The Eleventh Amendment has two exceptions: "First, Congress may abrogate a State's immunity by expressly authorizing such a suit pursuant to a valid exercise of power. Second, a State may waive its sovereign immunity by consenting to be sued in federal court." *Maysonet-Robles v. Cabrero*, 323 F.3d 43, 49 (1st Cir. 2003) (internal citations omitted). Eleventh Amendment sovereign immunity is jurisdictional in nature, and "absent waiver, neither a State nor its agencies acting under its control may be subject to suit in federal court." *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 144 (1993).

The Attorney General's Office is a department of the state government, and therefore falls within the ambit of the Eleventh Amendment's protection. *See, e.g.,* Mass. Gen. Laws ch. 12, § 1. *See generally Wojcik*, 300 F.3d at 99-101. Furthermore, the complaint fails to implicate either of the exceptions to that immunity. It is well-settled law that the "enactment of § 1983 did not abrogate the Eleventh Amendment immunity of the states." *Colon-Rivera v. Puerto Rico Dept. of Social Services*, 736 F.2d 804, 806 n.2 (1st Cir. 1984) (interpreting the Supreme Court's decision in *Quern v. Jordan*, 440 U.S. 332, 341 (1979)); *see also Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) (neither state nor its officials are "persons" for purposes of § 1983). Furthermore, the Commonwealth has not waived its immunity in the context of this suit

7

or statute. *See generally* Mass. Gen. Laws ch. 140, §§ 131, 131P (containing no waiver language); *cf. College Savings Bank v. Florida Prepaid Postsecondary Ed. Expense Bd.*, 527 U.S. 666, 680 (1999) (holding that sovereign immunity may be waived only if a state legislature makes "clear declaration" of waiver).

Accordingly, to the extent that the complaint seeks money damages against the Attorney General's Office, it will be dismissed for lack of subject-matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1).

### B. Motion of Boston Defendants

The Boston Defendants have moved to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6).[3]

O'Connell contends that all financial costs required by the Massachusetts and Boston licensing regime unconstitutionally burden his Second Amendment right. (*See* Compl. Ex. 1 ¶ 6 ("This case is very simple. Either we have to pay for a constitutional right or we do not.")). O'Connell does not allege that any non-pecuniary licensing requirements are unconstitutional—he takes issue only with the financial costs.

"Section 1983 supplies a private right of action against a person who, under color of state law, deprives another of rights secured by the Constitution or by federal law." *Redondo–Borges*

---

[3] The Boston Defendants also contend that claim preclusion should bar the suit. Although it is true that O'Connell previously filed a similar complaint, *see O'Connell v. Walsh*, WL 9581735 (D. Mass. Dec. 30, 2015), the court dismissed that claim primarily, if not entirely, on ripeness grounds. Because a dismissal on ripeness grounds is jurisdictional, *see, e.g., Valentin v. Hosp. Bella Vista,* 254 F. 3d 358, 363 (1st Cir. 2001), the earlier case was not resolved on the merits and claim preclusion does not apply. *See also Airframe Systems, Inc. v. Raytheon Co.*, 601 F.3d 9, 14 (1st Cir. 2010) ("Claim preclusion applies if (1) the earlier suit resulted in a final judgment on the merits, (2) the causes of action asserted in [two] suits are sufficiently identical or related, and (3) the parties in the two suits are sufficiently identical . . . .") (citations omitted); Fed. R. Civ. P. 41(b) ("[A]ny dismissal not under this rule—except one for lack of jurisdiction, improper venue, or failure to join a party under Rule 19—operates as an adjudication on the merits."). In any event, even if the court in that case did reach issues beyond ripeness, the complaint was dismissed without prejudice. *See* Fed. R. Civ. P. 41(b) ("*Unless the dismissal order states otherwise*, a dismissal under this subdivision . . . operates as an adjudication on the merits.") (emphasis added).

*v. U.S. Dep't of Hous. & Urban Dev.*, 421 F.3d 1, 7 (1st Cir. 2005) (quoting *Evans v. Avery*, 100 F.3d 1033, 1036 (1st Cir. 1996)). A cause of action under § 1983 requires proof of two elements: first, the conduct complained of must have been carried out "under color of state law," and second, that conduct must have worked a deprivation of rights guaranteed by the Constitution or laws of the United States. *Grajales v. P.R. Ports Auth.*, 682 F.3d 40, 46 (1st Cir. 2012) (quoting *Martinez v. Colon*, 54 F.3d 980, 984 (1st Cir. 1995)). As set forth below, because the complaint fails to allege the second element of a § 1983 claim, the motion to dismiss will be granted.

## 1. "Under Color of State Law"

The first question is whether the financial costs at issue were imposed by persons acting under color of state law.

O'Connell alleges that the Boston licensing regime has cost him $300. He paid the first $100 to Mass Firearms School for a Firearm Safety Certificate, (Compl. Ex 1, ¶ 2); the second $100 alongside his application as required by statute, (*Id.* ¶ 1); and the final $100 to Mass Firearms School for additional instruction to prepare for the live course required in Boston, (*Id.* ¶ 12).

The Court is skeptical that the imposition of fees by a private firearms school satisfies the "under color of state law" requirement. Both fees involved payments made to a private party that were not directly required by any statute. However, because "[t]his inquiry is typically factbound," *Jarvis v. Village Gun Shop, Inc.*, 805 F.3d 1, 8 (1st Cir. 2015), for present purposes the Court will assume that all three of the fees were, in one form or another, charged or required by persons acting under color of state law.

9

## 2. Deprivation of a Constitutional Right

The second question is whether the alleged conduct improperly deprived O'Connell of a right guaranteed by the Constitution.

In *Gould v. Morgan*, the First Circuit adopted a two-step approach for analyzing Second Amendment claims. 907 F.3d 659, 668-69 (1st Cir. 2018). "Under this approach, the court first asks whether the challenged law burdens conduct that falls within the scope of the Second Amendment's guarantee. This is a backward-looking inquiry, which seeks to determine whether the regulated conduct was understood to be within the scope of the right at the time of ratification . . . . If the challenged law imposes no such burden, it is valid. If, however, it burdens conduct falling within the scope of the Second Amendment, the court then must determine what level of scrutiny is appropriate and must proceed to decide whether the challenged law survives that level of scrutiny." *Id.* (internal quotations and citations omitted). The Court will analyze the fees at issue under that framework.

### a. Scope of Second Amendment Right

The Court will first assume, without deciding, that the challenged fees burden conduct within the scope of the Second Amendment's protections.

In *Gould*, plaintiffs challenged the Boston and Brookline firearm-licensing schemes, which granted unrestricted firearm licenses only when an applicant "articulate[d] a reason to fear injury to himself or his property that distinguishes him from the general population." *Id.* at 664. The First Circuit, after considering regional approaches to firearms regulations in the first half of the nineteenth century, found the scope of the Second Amendment right outside of the home to be difficult to determine accurately. *Id.* at 670. Accordingly, and in the absence of specific guidance from the Supreme Court, the court "proceed[ed] on the assumption that the Boston and

Brookline policies burden the Second Amendment right to carry a firearm for self-defense." *Id.;* s*ee also Worman v. Healy*, 922 F.3d 26, 36 (1st Cir. 2019) (assuming, without deciding, that partial assault-weapon ban burdened conduct within Second Amendment right). That approach is also appropriate here.

### b. <u>Level of Scrutiny</u>

The Court will next consider what level of scrutiny must be applied to the challenged fees.

"Strict scrutiny does not automatically attach to every right enumerated in the Constitution." *Gould*, 907 F.3d at 670 (citing *Kelo v. City of New London*, 545 U.S. 469, 480 (2005) (refusing to apply strict scrutiny in Takings Clause context); *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (applying intermediate scrutiny to content-neutral time, place, and manner restriction challenged on First Amendment grounds)). In the Second Amendment context, "the appropriate level of scrutiny [] turn[s] on how closely a particular law or policy approaches the core of the Second Amendment right and how heavily it burdens that right." *Id.* at 670-71 (citing *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of ATFE*, 700 F.3d 185, 195 (5th Cir. 2012); *Ezell v. City of Chicago*, 651 F.3d 684, 703 (7th Cir. 2011)). "[T]he core of the Second Amendment right is limited to self-defense in the home." *Id.* at 671 (citing *Hightower v. City of Boston*, 693 F.3d 61, 72 (1st Cir. 2012)).

The first inquiry, then, is whether the fees at issue burden the right of self-defense within one's home. The fees do in fact impose a financial cost on legally owning a firearm, regardless of its intended purpose. And O'Connell has expressly stated that his purpose for wanting an LTC is, in part, "for protection of [his] home," (Compl. Ex. 9).

But even if the Boston licensing requirements burden the core Second Amendment right,

intermediate scrutiny may still be appropriate. In *Worman v. Healey*, the First Circuit considered a Massachusetts law "proscribing the sale, transfer and possession of certain semiautomatic assault weapons and large-capacity magazines." 922 F.3d at 30. In considering the appropriate level of scrutiny to apply, the court declined to state definitively that the law did not, at least to some degree, "burden the core Second Amendment right of self-defense within the home." *Id.* at 37. However, the court held that "intermediate scrutiny is appropriate as long as the challenged regulation either fails to implicate the core Second Amendment right or fails to impose a substantial burden on that right." *Id.* at 38. In other words, even if the law at issue burdens the right to self-defense within the home, intermediate scrutiny must be applied if the burden is not substantial.

Assuming, without deciding, that the challenged law burdens the core Second Amendment right, intermediate scrutiny remains appropriate. The fees at issue surely present a lesser burden on the core Second Amendment right than the regulation in *Worman*. In *Worman*, the challenged law presented a permanent and insurmountable hurdle to defending one's home with a whole class of banned weapons and equipment. 922 F.3d at 30. Here, in contrast, the complaint challenges the payment of $300 in fees in the context of a six-year license. (Compl. Ex. 6); *see also* Mass. Gen. Laws ch. 140, § 131. Those fees present, at most, a marginal burden on the core Second Amendment right; the right remains entirely intact for anyone who has paid the fees and otherwise qualified for an LTC.

This conclusion comports with caselaw in other circuits. Nationwide, there is a "near unanimous preference for intermediate scrutiny" in the Second Amendment context. *Tyler v. Hillsdale County Sheriff's Department*, 837 F.3d 678, 692 (6th Cir. 2016); s*ee also, e.g., Drake v. Filo*, 724 F.3d 426, 436-37 (3d Cir. 2013) (applying intermediate scrutiny to New Jersey

12

handgun regulation with a "justifiable need" requirement); *Tyler*, 837 F.3d at 691-92 (applying intermediate scrutiny to application of 18 U.S.C. § 922(g)); *Silvester v. Harris*, 843 F.3d 816, 827 (9th Cir. 2016) (applying intermediate scrutiny to regulation that imposed 10-day waiting period); *Bonidy v. U.S. Postal Service*, 90 F.3d 1121, 1126 (10th Cir. 2015) (applying intermediate scrutiny to U.S. Postal Service regulation on firearm possession in and around buildings).

Furthermore, courts have consistently assessed firearm-licensing fees under an intermediate-scrutiny standard. In *Kwong v. Bloomberg*, the Second Circuit held that a provision of the New York City Administrative Code did not violate the Second Amendment in charging a $340 fee for New York City residents to obtain a handgun permit. 723 F.3d 160, 161 (2d Cir. 2013).[4] In that case, the fee was $340 for a three-year permit—more than twice the per-year costs at issue here. *Id.* The court held that strict scrutiny was inappropriate and considered the challenged law under intermediate scrutiny. *Id.* at 167-68 ("[W]e find it difficult to say that the licensing fee, which amounts to just over $100 per year, is anything more than a marginal, incremental or even appreciable restraint on one's Second Amendment rights . . . .") (internal quotations omitted). The court noted that the mere fact that a right became more expensive did "not necessarily mean that it 'substantially burdens' that right," implying that even intermediate scrutiny may be too stringent. *Id.* at 168. *See also Bauer v. Becerra*, 858 F.3d 1216, 1222 (9th Cir. 2017) (applying intermediate scrutiny to fees of $19 on firearm purchases).

Accordingly, an intermediate-scrutiny standard will be applied to the challenged fees.

---

[4] The court actually considered this law under two frameworks. First, it found that the fee was permissible under the Supreme Court's "fee jurisprudence," adapted from the First Amendment context. *Id.* at 165-67. Second, as discussed, it considered this fee under the "unconstitutional burden" framework. *Id.* at 167-69.

### c. Applying the Intermediate-Scrutiny Standard

Under the intermediate-scrutiny standard, a statute "must be substantially related to an important governmental objective" to withstand a constitutional challenge. *Gould*, 907 F.3d at 672 (quoting *Clark v. Jeter*, 486 U.S. 456, 461(1988)). "To achieve this substantial relationship, there must be a 'reasonable fit' between the restrictions imposed by the law and the government's valid objectives, 'such that the law does not burden more conduct than is reasonably necessary.'" *Worman*, 922 F.3d at 38 (quoting *Gould*, 907 F.3d at 674).

The first step in applying the intermediate-scrutiny standard involves identifying the government interest. "The legislative purpose behind [the Massachusetts firearms licensing statute] is twofold: to promote public safety and to prevent crime." *Gould*, 907 F.3d at 673 (citing *Chardin v. Police Comm'r of Boston*, 465 Mass. 314 (2013); *Commonwealth v. Seay*, 376 Mass. 735 (1978)). "[F]ew interests are more central to a state government than protecting the safety and well-being of its citizens." *Gould*, 907 F.3d at 673.

The next question is whether the fees at issue "[are] substantially related to those [government] interests." *Worman*, 922 F.3d at 39. In assessing that relationship, the starting point is "the premise that [the court] ought to give 'substantial deference to the predictive judgments' of a state legislature engaged in the enactment of laws." *Gould*, 907 F.3d at 673 (quoting *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 195 (1997)). While that premise does not mandate "blind allegiance" by the court, "a legislature's chosen means need not be narrowly tailored to achieve its ends: the fit between the asserted governmental interests and the means chosen by the legislature to advance them need only be substantial in order to withstand intermediate scrutiny." *Id.* at 674. The court must only find that "the law does not burden more conduct than is reasonably necessary" to find that it passes muster. *Id.* (quoting *Drake*, 724 F.3d

at 436).

Here, two of the costs associated with the licensing requirements, as noted, were private training-school fees: the $100 fee paid to a firearm-training school to obtain a safety certificate and the $100 fee to the same school to learn how to handle the revolver used in the mandatory Boston Police training course.[5] Both pass intermediate scrutiny. First, those costs are marginal in the context of a license that lasts for five to six years. *Cf. Kwong*, 723 F.3d at 161 (upholding $340 fee for firearms license lasting only three years); *Heller III*, 801 F.3d at 278 (upholding fees of $13 per firearm and $35 for fingerprinting as part of gun licensing scheme because "'administrative . . . provisions incidental to the underlying regime'—which include reasonable fees associated with registration—are lawful insofar as the underlying regime is lawful.") (quoting *Heller v. District of Columbia (Heller II)*, 670 F.3d 1244,1249 (D.C. Cir. 2011)). Second, each cost is tied to a requirement that surely advances the asserted government interest: the safety certificate and live course enhance public safety by ensuring that gun owners do not endanger themselves or others with unsafe practices.

Furthermore, each requirement is structured so that it burdens no more protected conduct than is reasonably necessary. For example, the Massachusetts statute exempts from the safety-certificate requirement any individual who, whether employed by a state, armed service, or law enforcement agency, is "authorized by a competent authority to carry or possess the weapon . . . within the scope of his duties." *See* Mass. Gen. Laws ch. 140, § 131P(a). Additional instruction, leading to a certificate, is only required of those individuals who cannot be presumed to have been trained in firearm safety.

---

[5] Again, the analysis will presume that both fees were imposed under color of state law.

The $100 fee associated with the application also survives analysis under the intermediate-scrutiny standard. The proceeds from the fee are substantially, if not entirely, allocated towards defraying the costs of administering the state licensing scheme. Out of the $100 fee, $25 is directed to the licensing authority administering LTCs, $50 is directed to the general fund of the Commonwealth (which allocates at least $50,000 annually to the Firearm Licensing Review Board), and $25 is directed to the Firearms Fingerprint Identity Verification Trust Fund. Mass. Gen. Laws ch. 140, § 130B; *see also* Mass. Gen Laws ch. 29, § 2LLL (establishing Firearms Fingerprint Identity Verification Trust Fund to support state police background check system). Each of the entities that receives a portion of the application fee completes work that is integral to the Commonwealth's licensing scheme. Because that licensing scheme is directly aimed at ensuring public safety and reducing crime, the fee is inherently tied to the government interest. Furthermore, that result comports with similar decisions around the country. *See, e.g., Kwong*, 723 F.3d at 161 (upholding $340 license fee); *Heller III*, 801 F.3d at 278 (upholding a $14 per-weapon fee and $35 fingerprint fee); *Justice v. Town of Cicero, Ill.*, 827 F. Supp. 2d 835, 842 (N.D. Ill. 2011) (upholding $25 application fee).

In sum, the disputed fees do not place an impermissible burden on O'Connell's Second Amendment rights, and therefore they do not violate the Constitution. Accordingly, to the extent that the complaint seeks injunctive relief and money damages against the individual defendants, it fails to state a claim upon which relief can be granted and will be dismissed.

## IV.    Conclusion

For the foregoing reasons, both motions to dismiss are GRANTED.

**So Ordered.**

Dated:  April 10, 2020

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV
Chief Judge, United States District Court